PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
NARCISO GÓMEZ, Defendant and Appellant.

No. 4886.   Argued February 14, 1934.—Decided July 26, 1934.

*R. Martínez Nadal* and *F. Navarro Ortiz* for appellant.   *R. A. Gó-
mez, Fiscal,* for appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

Narciso Gómez was for twelve years a member of the
Santo Domingo police force wherein he arose to the rank
of captain and was assigned to duty in several positions of
considerable importance and responsibility.   Later, after a
somewhat varied experience in business which ended in bank-
ruptcy, he came to Puerto Rico and began life anew as a
bootlegger.   He says that he conducted this business with
"some discretion and all respect for the authorities".   He
was twice tried upon an information for murder, finally con-
victed of manslaughter and received a sentence of three
years in the penitentiary.

Natividad Rodríguez was a destitute woman with a babe
in her arms when Narciso Gómez made her acquaintance and
built a home for her in which they lived together.   Later he
placed one of her two children in an institution known as
Robinson School, where he would receive suitable training
and educational advantages.

A servant says that on a certain occasion when Gómez was about to leave the house for a few days there was some sort of a domestic quarrel. After Gómez started on his trip "Natita" also left the house and returned later in the day with Oscar Morales, a soldier, who remained from Monday until Wednesday evening. In the meanwhile Natita told the servant that Oscar's clothes were to be washed in the house. Natita's acquaintance with Morales seems to have antedated her acquaintance with Gómez, but there is nothing to show that after becoming the mistress of Gómez she had continued or renewed her relations with Morales prior to the date of his three day visit.

On the Monday following the three day visit of Morales, Gómez took Natita, the servant and the two children with him on a trip to Humacao and Naguabo. They returned between eight or nine o'clock in the evening and stopped in the rear of the house where a number of hand bags and packages were removed from the car and placed on the back porch. There was also another package on the back porch which, on being picked up and examined by the servant, was found to contain soiled clothing belonging to Morales. Gómez made some inquiry as to the contents of this package but received an evasive reply and did not insist upon a direct answer. Instead he went around to the front door where he entered and came through the house in order to open the back door from the inside. Then he returned to the front of the house where he had left his key in the lock of the front door. About this time the chauffeur saw a man standing behind the car. When this man saw the chauffeur come out of the back door he abandoned his position behind the car and went around to the front of the house. Something in the actions or demeanor of this man caused the chauffeur to start the car and to follow him to a point near the front corner of the house where he stopped the car. There he heard a sound of voices inside the house but could not understand what was said because of the noise made by the motor.

Next he heard the noise of a struggle followed by a number of shots the first of which shattered the glass in the front door. The chauffeur and the car had been hired only for the trip. The chauffeur at the sound of the first shot crouched in his seat until the shooting was over, whereupon he hurried home, reported the incident to his wife, and then returned to the scene of the shooting where he made his statement before the municipal judge and a corporal of the insular police who had arrived and were making an investigation.

Gómez says that while he was removing the key from the front door he heard the sound of foot steps behind him, turned and found himself face to face with Morales who said in a very imperative tone that he wished to speak to witness; that witness replied "What do you want?"; that Morales began to say something that witness did not understand and because of his disrespectful tone witness told him to go, and turned to enter the house; that Morales followed witness and when witness heard him coming into the house, witness again turned but before he could speak, Morales, who was then inside the house some two feet from the threshold, struck the first blow; that witness fell against the victrola and when witness recovered his balance and attempted to return the blow his fist struck something hard; that witness did not know whether it was something Morales had in his hand or something else; that Morales advanced upon witness trying to get hold of him and witness turned, stepped into an adjoining bedroom, picked up a pistol from a table beside the doorway and opened fire; that the pistol was an automatic which would continue firing as long as there were any cartridges left in it unless the trigger were released and that witness in his disturbed state of mind did not release the trigger.

Dolores Rodríguez, the servant, testified that while she was removing the last of the packages from the back porch she heard a shot; that she dropped the package, went into the house and saw Gómez and Morales grappling with each

other, in the doorway; that they both fell inside, Morales underneath, and Gómez upon him; that Gómez then arose, drew his pistol and fired a number of shots into the prostrate body of Morales who did not arise from the floor; and that Morales lay with his feet toward the door.

Rafael Nadal who lived in a house across the street heard the shooting and immediately thereafter went to see what had happened. He testified that he saw Gómez sitting in a rocking chair with a bruise on his forehead; that the glass in the front door was shattered, that the door was half open; that during the afternoon of the same day the glass had been intact; and that the shots had been fired in rapid succession.

The police corporal, who with the municipal judge arrived on the scene within a few minutes after the shooting, testified that Gómez had a bruise upon his forehead; that the glass in the front door had been shattered and that certain micks in the concrete balustrade of the front porch looked as if they might have been made by bullets.

The wounds upon the body of Morales were all made by bullets which entered the front and some of which passed entirely through the body. The back of the coat which Morales wore at the time of the shooting was perforated in three places. The testimony of the servant as to the interval which she said had elapsed between the first shot and those which followed is contradicted by the testimony of the chauffeur as well as by that of Nadal.

A physician who examined Gómez shortly after the shooting found in addition to a bruise upon his forehead a severe contusion upon his back and a scratch or abrasion upon one of the knuckles of his right hand. He testified that Gómez was a man of about sixty who was suffering from chronic nephritis as well as a general hardening of the arteries; and that a blow violent enough to have produced the bruise on the forehead would have suffice to knock a man down or to throw him backward against a piece of furniture.

The record is permeated with persistent suggestions and insinuations that Natividad Rodríguez was or had been a prostitute. The district attorney brought out on the cross examination of Gómez that he had left a wife and family in Santo Domingo. His testimony showed however that he had returned to Santo Domingo on several occasions after coming to Puerto Rico and there was nothing to show that his wife and family in Santo Domingo were not provided for. Gómez also admitted on cross examination that he had been twice prosecuted in the Federal Court for alleged violations of the Volstead Act. He said that he had been acquitted of the first offense and in the second case had been sentenced to pay a fine of three hundred and fifty dollars and costs. There was much more testimony concerning this matters than there was concerning the killing itself. These different aspects of the case may have combined to prejudice the defendant in the eyes of the jury but by none of them nor by all of them together was he deprived of his right of self defense. The house which he had built and presented to his mistress was still the house in which he lived as head and master thereof. It was his home and his castle, notwithstanding the fact that the legal title thereto had vested in Natividad Rodríguez. He had a perfect right to order Morales out of the house and to eject him by force if necessary.

The fact that Natividad Rodríguez held the legal title to the house and lot, coupled with the fact of the relationship established between Natividad Rodríguez and Morales during the recent absence of Gómez and taken in connection with the peculiar circumstances immediately preceding the demand for an interview, lends some color to the testimony of Gómez as to the aggresive attitude of Morales. The testimony of Gómez as to what occurred inside the house, if true, establishes a clear case of self defense. It is contradicted only by the testimony of the servant. Her statement is negative and rendered nugatory by the significant fact that no bullet holes nor marks that might have been made by bullets were

found upon the floor or elsewhere in the room. The number and nature of the wounds received by Morales practically eliminate the possibility of any theory that after receiving them he might have struck the blow which bruised Gómez. If we put out of view the testimony of the servant, the testimony of Gómez is quite consistent with all the other facts and circumstances in the case.

It may be conceded that the character of Gómez is unsavory. It may be conceded that the evidence does not exclude the theory of manslaughter as a reasonable possibility. It may even be conceded that the theory of manslaughter is quite as plausible and probable as is the theory of self defense, but that is not enough to sustain a verdict and judgment of conviction. Section 236 of the Code of Criminal Procedure reads as follows:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal."

Unless that statutory provision has become or is to become a dead letter which should be honored more in the breach than in the observance thereof, then the judgment appealed from should be reversed and the action dismissed.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.

#### DISSENTING OPINION OF MR. JUSTICE WOLF

This was a case where the shooting was clearly admitted. Hence, unless the evidence of the people showed some justification the defendant was bound to introduce evidence tending to show the self defense of which the majority opinion speaks. Thereafter, of course, the jury ought not to have convicted if it had a reasonable doubt of the guilt of Gómez. However, the jury was not bound to believe the statements of the defendant. It had a complete right to believe that the evidence did not show that the appellant acted in self defence. The question of reasonable doubt was for the jury and not

for the courts. *People* v. *Colón,* 42 P.R.R. 52. No complaint is made of the instructions and I cannot see that the jury was not absolutely entitled to find for manslaughter, as it did. It is impossible for me to realize from the facts of this case that the jury ought to have had a reasonable doubt. The government made out a *prima facie* case of guilt under Section 236 of the Code of Criminal Procedure or otherwise. That section could not, in my opinion, become a dead letter if the judgment of the lower court had been affirmed.

I am authorized to state that Mr. Justice Aldrey agrees with this dissent.